**IT IS ORDERED as set forth below:**

**Date: September 30, 2024**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 22-50369-JWC |
| PARKER MEDICAL HOLDING COMPANY, INC., *et al.*, | CHAPTER 11 |
| | JOINTLY ADMINISTERED |
| Debtors. | |
| FIRST-CITIZENS BANK & TRUST COMPANY, | |
| Plaintiff/Counterclaim Defendant, | |
| v. | |
| PARKER MEDICAL HOLDING COMPANY, INC.; MIDWEST MEDICAL ASSOCIATES, INC.; and RICHARD L. PARKER, SR., | ADV. PRO. NO. 22-05010-JWC |
| Defendants/Counterclaim Plaintiffs, | |
| and | |
| PEACHTREE MEDICAL PRODUCTS, LLC; MIDWEST MEDICAL DME | |

1

ENTERPRISES, LLC; and MIDWEST
MEDICAL ENTERPRISES, LLC,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court is First-Citizens Bank & Trust Company's Motion for Summary Judgment (Doc. No. 103) (the "Motion"). This case started as a simple breach of contract action on two promissory notes and related guaranties. Each Defendant asserts multiple affirmative defenses based on allegations that First Citizens promised to extend the maturity date on one of the promissory notes but then breached that promise. Three Defendants assert counterclaims asserting the alleged breach caused them damages. First Citizens requests summary judgment on its breach of contract claims and all counterclaims and defenses. For the reasons discussed below, the Court will grant in part and deny in part the Motion.

## I.    Procedural Background, Claims, Counterclaims, and Defenses

First Citizens initiated this action in state court in 2021. The complaint, as amended, asserts seven remaining counts:[1]

- Count I: breach of contract against Parker Medical Holding Company, Inc. ("Parker Medical") for amounts due on a promissory note called the "973 Note."

- Count II: breach of contract against Parker Medical and Peachtree Medical Products, LLC ("Peachtree Medical") for amounts due on a promissory note called the "063 Note."

- Count III: breach of contract against Parker Medical for breaches of a Master Agreement and Supplemental Loan Agreement executed in connection with the 973 Note.

---

[1] First Citizens asserted counts for appointment of a receiver and a restraining order/injunction prohibiting transfers. These counts are no longer active given the pending bankruptcy of three of the Defendants.

- <u>Count IV</u>: breach of contract against Midwest Medical Associates, Inc. ("Midwest Medical"), Midwest Medical DME Enterprises, LLC ("Midwest DME"); Midwest Medical Enterprises, LLC ("Midwest Enterprises"); and Richard L. Parker ("Mr. Parker") for breaching their respective guaranties of all amounts due under the 973 Note. These Defendants are referred to as the "Guarantor Defendants."

- <u>Count VII</u>: contractual attorneys' fees pursuant to the Supplemental Loan Agreement.

- <u>Count VIII</u>: attorneys' fees pursuant to O.C.G.A. § 13-6-11.

- <u>Count IX</u> – breach of contract against the Guarantor Defendants for breaching their respective guaranties for amounts due under the 063 Note.

First Citizens asserts a little over $3 million owed on the 973 Note and a little over $332,000 owed on the 063 Note, plus accruing interest and attorney's fees.

Three Defendants—Parker Medical, Midwest Medical, and Mr. Parker (the "Counterclaim Defendants")—answered the complaint and filed the following counterclaims against First Citizens:

- <u>Counterclaim I</u>: breach of contract for failing to honor an alleged extension of the maturity date of the 973 Note.

- <u>Counterclaim II</u>: abandonment of course of dealing and mutual departure for not extending the maturity date of the 973 Note.

- <u>Counterclaim III</u>: intentional or negligent misrepresentations that First Citizens would extend the maturity date of the 973 Note.

Mr. Parker, individually, also asserted <u>Counterclaim IV</u> for the loss of value of his ownership interests in Parker Medical caused by First Citizens' alleged breaches.

All Defendants asserted the following affirmative defenses:

- Failure to state a claim

3

- Offset

- Novation

- Mutual departure

- Failure to mitigate

- Impairment of collateral

- Interference and excuse of performance

- Failure of consideration

- Frustration of purpose

- Impossibility of performance

- Waiver

- Unclean hands

- Equitable estoppel

- Estoppel

While the case was pending in state court, three Defendants—Parker Medical, Midwest Medical, and Peachtree Medical (the "Debtors")—filed chapter 11 bankruptcy cases January 14, 2022. Parker Medical removed the state court litigation to this Court by filing a notice of removal January 17, 2022. Each of the other five Defendants consented to removal, and each Defendant filed reservations of their rights to a jury trial. Mark A. Smith was appointed chapter 11 trustee (the "Trustee") of the Debtors in April, 2022.

First Citizens filed an initial motion for summary judgment November 21, 2022 (Doc. No. 21) (the "First MSJ"). The Defendants requested that the Court defer

ruling on the First MSJ so they could engage in additional discovery. The Court agreed with the Defendants and denied the First MSJ without ruling on its merits and without prejudice by Order entered March 31, 2022 (Doc. No. 47) for the reasons explained in a concurrent Memorandum Opinion (Doc. No. 48) (the "Previous Opinion"). The Court further found that the Trustee controls all five corporate Defendants either directly or indirectly, and counsel for Mr. Parker has no authority to represent or act on behalf of any Defendant other than Mr. Parker.

The parties engaged in additional discovery, after which First Citizens filed the Motion currently before the Court February 7, 2024, together with its Statement of Undisputed Material Facts (Doc. No. 103-3) (the "FCB SOMF") and numerous exhibits. First Citizens requests summary judgment in its favor on all claims, counterclaims, and affirmative defenses.

The Trustee filed his Response to Motion for Summary Judgment (Doc. No. 109) and a Response to Statement of Undisputed Material Facts (Doc. No. 109-1) in which he opposes summary judgment but largely defers to Mr. Parker to develop the factual and legal bases for the counterclaims and defenses.

Mr. Parker filed his opposition to the Motion (Doc. No. 110), a response to the FCB SOMF (Doc. No. 110-30) ("Parker's SOMF Response"), his own Statement of Material Facts About Which There Exist Genuine Issues to Be Tried (Doc. No. 110-1) (the "Parker SOMF"), and numerous exhibits, including a Declaration by Mr. Parker in support of his opposition (Doc. No. 110-3) ("Parker's Declaration").

Finally, First Citizens filed a response to the Parker SOMF (Doc. No. 112), an objection to the Parker Declaration (Doc. No. 113),[2] and a reply in support of the Motion (Doc. No. 114). The Court carefully reviewed each of the foregoing documents and the exhibits filed with them.

## II.   Jurisdiction

In the Court's Previous Opinion (Doc. No. 48), the Court concluded that it has jurisdiction to hear this adversary proceeding and all claims, counterclaims, and defenses asserted herein pursuant to 28 U.S.C. § 1334 and issue interlocutory orders on all matters raised in this adversary proceeding. Further, First Citizens' claims against the Debtors (Parker Medical, Peachtree Medical, and Midwest Medical) and the counterclaims of Parker Medical and Midwest Medical are core claims on which this Court may enter final orders and judgments. First Citizens' claims against Mr. Parker, Midwest DME, and Midwest Enterprises, and Mr. Parker's counterclaims against First Citizens are not core, and the Court does not have authority to enter final orders or judgments on such claims. The Court may, however, enter proposed findings of fact and conclusions of law to be submitted to the district court for final order or judgment on the non-core claims.

---

[2] The objection requests that the Court disregard the Parker Declaration on various bases, but specifically requests the Court to disregard paragraphs 6, 7, 8, 9, 13, 14, and 16. Although the Court agrees with some contentions that certain statements in the Parker Declaration make conclusory statements, the Court disagrees with various contentions made by First Citizens in the objection. Regardless, the Court's ruling is not dependent on any specific paragraph in the Parker Declaration, and the Court has not cited to it herein. To the extent a ruling on the objection is necessary, it is overruled.

## III.   Conclusions of Undisputed Material Facts

Mr. Parker has been in the business of selling medical products since at least 1989. [Parker SOMF ¶ 1.] He ran his business through a variety of corporate entities, including each of the corporate Defendants named in this adversary proceeding, which he owns either directly or indirectly. [*Id.* ¶ 2.] The Defendants had a banking relationship with Larry "Skip" McPheeters that began in 2011 while he worked at SunTrust Bank. [*Id.* ¶¶ 3-4.] The Defendants' banking relationship followed McPheeters to Iberiabank in 2016 and then again to First Citizens in 2018 where McPheeters was a Senior Vice President. [*Id.* ¶¶ 5-6.] McPheeters was the Defendants' primary contact at First Citizens until April, 2021. [*Id.* ¶ 9.]

### A.   The 973 Line

In September, 2018, Parker Medical established a revolving line of credit with First Citizens for up to $2.5 million (the "973 Line"). Parker Medical executed a Promissory Note titled Capital Manager Note (the "973 Note"), which promised to repay amounts borrowed under the 973 Line. [FCB SOMF ¶ 1; Shornock Dec.,[3] ¶ 3, Ex. A.] The original maturity date on the 973 Note was September 25, 2020. [*Id.*] First Citizens and Parker Medical increased the 973 Line to $3 million by a modification agreement dated May 20, 2020; the modification did not include an extension of the maturity date. [*Id.*] Mr. Parker signed the 973 Note and modification

---

[3] Declaration of Jeffrey Shornock in Support of First-Citizens Bank & Trust Company's Motion for Summary Judgment filed at Doc. No. 21-3 ("Shornock Dec.").

on behalf of Parker Medical; McPheeters signed both the 973 Note and the modification on behalf of First Citizens as SVP. [*Id.*]

The 973 Note provides that it is governed by, and incorporates by reference, the terms of a Capital Manager Agreement (the "Master Agreement"). [*Id.*] The only Master Agreement the Court has found in the record is undated and unsigned. [FCB SOMF ¶ 2; Shornock Dec., ¶ 4, Ex. B-1.] Parker Medical and First Citizens also executed a Supplemental Loan Agreement for Revolving Line of Credit (the "Supplemental Agreement"), which provides that it supplements the Master Agreement. [FCB SOMF ¶ 2; Shornock Dec., ¶ 4, Ex. B-2.] Mr. Parker signed the Supplemental Agreement on behalf of Parker Medical; McPheeters signed the Supplemental Agreement on behalf of First Citizens as Commercial Banker, SVP. [*Id.*] The Master Agreement provides the following with respect to extensions of the maturity date:

> Either before or after the maturity date applicable to your Credit Line, we may, at our option, extend the term of your Capital Manager Account (and thereby postpone the maturity date) and/or permit you to renew or extend your Capital Manager Account under the same or different terms. We may do so by sending you a written notice; or we may require you to sign a modification.

[FCB SOMF ¶ 2; Shornock Dec., ¶ 4, Ex. B-1., ¶ 21.]

Parker Medical and three of the Defendants, Midwest Medical, Midwest DME, and Midwest Enterprises, each executed a Commercial Security Agreement. [FCB SOMF ¶ 3; Shornock Dec., ¶ 5, Exs. C-1, C-2, C-3, and C-4.] Each Commercial Security Agreement provides that the respective grantor granted First Citizens a security interest in all accounts, general intangibles, inventory, equipment, furniture,

furnishings, and other goods to secure the 973 Note. [*Id.*] Mr. Parker signed each Commercial Security Agreement on behalf of the respective borrower or grantor. [*Id.*]

Mr. Parker, individually, Midwest Medical, Midwest DME, and Midwest Enterprises (the Guarantor Defendants) each executed a Commercial Guaranty. [FCB SOMF ¶ 4; Shornock Dec., ¶ 6, Exs. D-1, D-2, D-3, and D-4.]. The Commercial Guaranties each provide that the respective guarantor "absolutely and unconditionally guarantees full and punctual payment and satisfaction of" all indebtedness owed by Parker Medical to First Citizens and "the performance and discharge of all of Parker Medical's obligations under the [973] Note and the Related Documents." [*Id.*] Mr. Parker signed each of the Commercial Guaranties, in his individual capacity for his own guaranty, and in his capacity as either president or member of the corporate entities. [*Id.*]

## B. __The P-Card__

Parker Medical also established a "P-Card" credit facility with First Citizens in September 2018. [FCB SOMF ¶ 5]. The P-Card was a separate credit facility from the 973 Line and allowed Parker Medical to make inventory purchases up to $1.5 million. [*Id.*; Shornock Dec., ¶¶ 7-8, Ex. E-1.] The P-Card facility did not, initially, include any specific collateral, security agreements, or separate commercial guaranty agreements (although the P-Card agreement included a personal guaranty paragraph signed by Mr. Parker). [*Id.*] McPheeters signed the initial P-Card agreement on behalf of First Citizens as Commercial Banker. [*Id.*] The P-Card facility

was later paid in full and closed and is not directly at issue in this case, but its existence is relevant for reasons discussed below.

### C.    **The 063 Line**

In January, 2020, Parker Medical and Peachtree Medical executed a Promissory Note (the "063 Note"), which promised to pay the principal amount of $500,000 in 48 monthly payments. [FCB SOMF ¶ 7; Shornock Dec., ¶ 9, Ex. F-1.] The 063 Note includes a provision making a default on any other agreement between the borrower and First Citizens to be a default under the 063 Note. [*Id*.]  Mr. Parker signed the 063 Note on behalf of Parker Medical and Peachtree Medical; McPheeters appears[4] to have signed the 063 Note on behalf of First Citizens as SVP. [*Id*.] Parker Medical, Peachtree Medical, and First Citizens also executed a Business/Commercial Loan Agreement pursuant to which First Citizens agreed to loan $500,000 to Parker Medical and Peachtree Medical (the "063 Loan Agreement"). [FCB SOMF ¶ 8; Shornock Dec., ¶ 10, Ex. F-2.] Mr. Parker signed the 063 Loan Agreement on behalf of Parker Medical and Peachtree Medical; McPheeters signed the 063 Loan Agreement on behalf of First Citizens as Senior Vice President. [*Id.*]

Parker Medical, Peachtree Medical, Midwest Medical, Midwest DME, and Midwest Enterprises, each executed a Commercial Security Agreement to secure the 063 Note. [FCB SOMF ¶ 10; Shornock Dec., ¶ 12, Exs. G-5, G-6, G-7, G-8, G-9.] Each Commercial Security Agreement provides that the respective grantor granted First Citizens a security interest in all accounts, general intangibles, inventory,

---

[4] McPheeters' name is not printed under the signature line on the 063 Note, but the signature is similar to his other signatures.

equipment, furniture, furnishings, and other goods to secure the 063 Note. [*Id.*] Mr. Parker signed each Commercial Security Agreement on behalf of the respective borrower or grantor. [*Id.*]

The Guarantor Defendants each executed a Commercial Guaranty in connection with the 063 Note. [FCB SOMF ¶ 9; Shornock Dec., ¶ 11, Exs. G-1, G-2, G-3, and G-4.]. The Commercial Guaranties each provide that the respective guarantor "absolutely and unconditionally guarantees full and punctual payment and satisfaction of" all indebtedness owed by Parker Medical to First Citizens and "the performance and discharge of all of Parker Medical's obligations under the [063] Note and the Related Documents." [*Id.*] Mr. Parker signed each of the Commercial Guaranties, in his individual capacity or in his capacity as either president or member of the corporate entities. [*Id.*]

### D.  Sale Efforts and Initial Extensions of the 973 Line

In 2020, Midwest Medical retained financial advisors and legal counsel to develop an offering statement for the sale of Mr. Parker's 100% ownership in Parker Medical, which owns 100% of Midwest Medical, Midwest DME, and Midwest Enterprises. Mr. Parker worked with the financial advisors and counsel to develop a "Midwest Enterprises Second Quarter 2020 Offering." [Parker SOMF ¶¶ 22-23.] By July 2020, the financial advisor received seven indications of interest and one letter of intent that included purchase prices in the range of $30 million to $42 million. [*Id.* ¶ 25-26.] Parker Medical executed a letter of intent with Culper Capital Partners'

("Culper") around August 17, 2020 (the "August LOI"), which initially contemplated a sale closing in October, 2020. [*Id.* ¶ 27, 30.]

Mr. Parker emailed McPheeters August 17, 2020, and informed him of the August LOI with Culper. [Parker SOMF ¶ 35.] Mr. Parker also thanked McPheeters for "pushing the line renewal." [*Id.* ¶ 36, Ex. 4.] McPheeters responded, "you've caught a whale! We extended the LOC maturity from 9/25 until 12/25." [*Id.*] The next day First Citizens issued a letter to Mr. Parker dated August 18, 2020, that extended the maturity date on the 973 Line to December 25, 2020 (the "August Extension Letter"). [*Id.* ¶ 37, Ex. 5.] The August Extension Letter states that it is "by: Skip McPheeters" with the title "Commercial Banker," but it is not signed by McPheeters or any other person and does not require any signature from Mr. Parker or anyone else. [*Id.*] The record is unclear regarding how the August Extension Letter was transmitted to Mr. Parker.

The Defendants' businesses experienced difficulties[5] in the second half of 2020, and Culper insisted on delaying any transaction for nine months. [Parker SOMF ¶ 30.] Culper insisted on more than mere delay, however, and negotiations under the August LOI ended in early October, 2020, without any definitive agreement for a transaction. [*See* FCB SOMF ¶ 19, Ex. M[6]; Parker's SOMF Response, Ex. A, 126:5-

---

[5] The parties dispute the specific causes of the financial difficulties. Defendants assert the difficulties were related to the COVID-19 pandemic and little else, while First Citizens argues the difficulties, although in part caused by COVID-19, also betrayed more fundamental issues with the Defendants' business model. The Court expresses no opinion or conclusions regarding the cause of the Defendants' difficulties in 2020, which is a disputed issue of fact.

[6] Although Mr. Parker disputes paragraph 19 of the FCB SOMF on a number of bases, he does not dispute that further negotiations under the August LOI terminated in October of 2020. Instead, he argues that Culper continued to be interested in a transaction in some form into 2021 and that he intended to submit a new offering in the summer of 2021.

25.] Nothing in the record suggests that any conduct of First Citizens caused negotiations under the August LOI to terminate in October of 2020, or that any further contract or LOI was ever signed by Defendants and any prospective buyers. There is some evidence, however, that purchasers continued to express interest in a transaction into 2021, and that Mr. Parker intended to make a new offering in the summer of 2021. [Parker's SOMF Response, Ex. A, 126:5-25.]

A letter dated December 16, 2020, was issued by First Citizens to Mr. Parker extending the maturity date of the 973 Line to March 25, 2021 (the "December Extension Letter"). [Parker SOMF ¶ 39, Ex. 7.] Other than the date of the letter and the maturity date, the December Extension Letter appears to be identical to the August Extension Letter, and there is likewise no indication of how or when the December Extension Letter was transmitted to Mr. Parker. On December 17, 2020, McPheeters emailed Mr. Parker stating, "The Capital Manager Line was approved until March 25, 2021." [*Id.* ¶ 38, Ex. 4.]

### E.    The P-Card Is Frozen and Renewed

First Citizens froze the P-Card in early 2021. [FCB SOMF ¶ 6].[7] To reinstate the P-Card, First Citizens and Parker Medical entered into several documents dated February 23, 2021, which created a new credit line up to $750,000 in favor of Parker Medical secured by $150,000 of cash in a deposit account at First Citizens. [*Id.*; Shornock Dec., ¶ 8, Ex. E-2.] The documents signed by Parker Medical include a promissory note, business loan agreement (signed by McPheeters on behalf of First

---

[7] First Citizens asserts it froze the P-Card because of a default; Mr. Parker asserts First Citizens had no grounds to freeze the P-Card. To the extent relevant, this is an issue of disputed fact.

Citizens), and assignment of a deposit account in connection with this new facility. [*Id.*] Midwest Medical, Midwest DME, and Midwest Enterprises each executed security agreements and guaranties for the facility, and Mr. Parker executed a separate guaranty. [*Id.*] The maturity date on the renewed P-Card was September 25, 2021. [*Id.*] As noted above, this P-Card facility was subsequently paid off and closed.

First Citizens produced during discovery an internal document called a BOSS Transaction Info Sheet (the "BOSS Sheet") that relates to the approval process for the renewed P-Card facility. [Parker SOMF ¶ 40-41, Ex. 8.] That document contains comments from First Citizens' employees Leigh Mays and Mindie Walker. [*Id.*] Leigh Mays's comments include the following: "Approved as presented as interim solution with appropriate concessions . . . aligning maturity w/actual LOC." [*Id.*][8] Mindie Walker's comments on the BOSS Sheet include the following: "we have matched the maturity of this facility to the likely maturity date of the capital manager – at that time we will consider consolidating the 2 facilities." [*Id.*] Although the Boss Sheet indicates that Leigh Mays approved the P-Card renewal February 18, 2021, the Boss Sheet does not otherwise indicate when any of the comments were made by either employee. [*Id.*]

On March 29, 2021, McPheeters sent Mr. Parker an email that attached the various documents requiring signature for the P-Card renewal. [Parker SOMF ¶ 44, Ex. 9.] Most of the email described the documents attached and how they should be

---

[8] First Citizens asserts that Mays's comment about the "actual LOC" referred to the P-Card. The Court draws no conclusion on this issue and concludes only that the BOSS Sheet includes the cited statement.

returned to the bank after signature, but the email concluded with the following statements: "The Pcard was renewed until Sept. 25, 2021. The LOC will also be renewed until 9-25-2021[.] This gives us breathing room – Reviewed Stmts, improved AR collections and adjusting to CFO over the spring/summer[.]" [*Id.*] The parties dispute the meaning of the statement that "The LOC will also be renewed until 9-25-2021" and whether this statement referred to the P-Card or the 973 Line.

### F.    <u>The Final Extension of 973 Line</u>

Internal correspondence from First Citizens dated March 29 through March 31 shows a flurry of activity at First Citizens related to a third extension of the 973 Line. The internal correspondence indicates that the 973 Line matured March 26, resulting in an overdraft by March 29 to the surprise of bank employees. Certain correspondence at least indicates that some bank employees, including McPheeters, believed the 973 Line was being extended to September 25, 2021, but the correspondence also indicates that such extension was never formally approved, and internal discussions led to a formal approval of an extension of only 60 days to May 25, 2021. [Parker SOMF ¶¶ 48-54, Exs. 12, 14-20.]

On March 30, 2021, McPheeters sent a text message to Mr. Parker stating, "I hope to have the renewal docs to you this afternoon." [Parker SOMF ¶ 49, Ex. 13.] The next day, March 31, McPheeters sent another text to Mr. Parker that "[t]he line was booked and will show on system later tonight." [*Id.* § 55, Ex. 21.] A letter dated March 31, 2021, was issued by First Citizens to Mr. Parker extending the maturity date of the 973 Line to May 25, 2021 (the "March Extension Letter"). [*Id.* ¶ 58, Ex.

22.] Other than the date of the letter and the maturity date, the March Extension Letter appears to be identical to the August and December Extension Letters, and there is likewise no indication of how or when the March Extension Letter was transmitted to Mr. Parker. [*Id.* ¶ 58, Ex. 22.]

On April 7, 2021, Jeff Higginbotham of First Citizens and McPheeters had a phone call with Mr. Parker and informed him of First Citizens' decision to exit the banking relationship with the Defendants and that the 973 Line would not be extended beyond 60 days. [FCB SOMF ¶ 26; Parker SOMF ¶ 64.]

On April 12, 2021, Mr. Parker sent an email to McPheeters in which he asked, "You recently had me sign these documents good through 9/25 and they are entitled Line of Credit or LOC. Is this correct or was this the P-card?" [FCB SOMF ¶ 29, Ex. X.] Mr. Parker followed up by text a few minutes later to seek a response to his email, and McPheeters responded the following day, "The $750m documents you signed were for Pcard." [*Id.* ¶¶ 30-31, Ex. Y.]

Between April 12 and May 25, 2021, Mr. Parker and McPheeters exchanged correspondence in which McPheeters continued to request information from Mr. Parker and at least suggested the 973 Line could be extended beyond May 25, 2021. [Parker SOMF ¶¶ 65-67, Exs. 27, 28.] Nothing in the record, however, suggests First Citizens agreed or represented after April 12, 2021, that it would extend the maturity date beyond May 25, 2021.

On July 1, 2021, First Citizens sent demand letters to the Defendants notifying them that First Citizens considered them to be in breach of the 973 Note, 063 Note,

and related guaranties. The demand letter for the 973 Note asserts that Parker Medical failed to pay the balance due upon maturity on May 25, 2021, failed to provide "all of the financial information requested by FCB in connection with its review of this loan," and that First Citizens reasonably believed the prospect of repayment to be "insecure." The demand letter asserts the amount due under the 973 Note is $3,087,321 as of June 30, 2021, plus a $180.36 per diem. The demand letter includes a demand for the Guarantor Defendants to immediately pay the amounts due and notified the Defendants that failure to pay within 10 days would entitle First Citizens to recover attorneys' fees. The demand letter on the 063 Note notified the Defendants that the default on the 973 Note constituted a default on the 063 Note. [FCB SOMF ¶ 42, Shornock Dec. ¶ 21, Ex. I.]

## IV.    Conclusions of Law

### A.    <u>Standard of Review</u>

Fed. R. Civ. P. 56, applicable through Fed. R. Bankr. P. 7056, allows the Court to enter summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918-19 (11th Cir. 1993).

A fact is material if it might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury [or finder of fact] could return a verdict for the nonmoving party." *Id.*

17

At the summary judgment stage of a proceeding, the Court's function is not to determine the truth of the matter by weighing the evidence, but rather to determine if there is a genuine issue for trial. *Id.* When making this determination, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir. 1985). "All reasonable doubts and inferences should be resolved in favor of the opponent." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985).

The moving party bears the burden of establishing the right to summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir. 1982). The moving party must identify those evidentiary materials listed in Federal Rule 56(c) that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(e).

Once the moving party makes a *prima facie* showing of its entitlement to judgment as a matter of law, the nonmoving party must go beyond the pleadings and demonstrate that a material issue of fact precludes summary judgment. *Celotex*, 477 U.S. at 324; *Martin v. Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir. 1991). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citations omitted).

**B.**   <u>**Issues of Fact Remain Regarding the 973 Note's Maturity Date**</u>

First Citizens asserts it has established its *prima facie* case that the Defendants breached the 973 Note, the 063 Note, the related guaranties, and other documents. All of First Citizens' claims, at least as presented in the Motion, hinge on its position that the 973 Note matured May 25, 2021. The breach of the 973 Note, the cross-default on the 063 Note, the breaches of the Master Agreement or Supplemental Agreement, the right to attorney's fees and default interest, and the breach of the various guaranties all flow from the assertion that the Defendants failed to pay the 973 Note at maturity on May 25, 2021.[9] The Court finds a material issue of fact remains as to whether the 973 Note in fact matured on May 25, or whether First Citizens extended the maturity date by written notice pursuant to the terms of the 973 Note and Master Agreement.

The Master Agreement governs extensions of maturity for the 973 Note. Its provisions, quoted above, require nothing beyond written notice. The Master Agreement does not require the written notice to take any specific form. It does not require the written notice to come from any specific person or source. It does not require signatures. It does not require any specific approval by the bank. It does not require new consideration, new terms, new documents, or any mutual agreement to anything. It requires only that the bank send written notice.

---

[9] Although First Citizens asserts there were other defaults under the 973 Note and related documents, it presented no evidence of such alleged defaults other than a footnote in the Shornock Dec. [Shornock Dec. ¶ 16 n.2.]. The Court makes no ruling on whether First Citizens can establish a separate breach of the 973 Note or other contracts or any other theory of recovery on the amounts loaned under the 973 and 063 Notes.

The Court finds an issue of material fact remains as to whether the March 29, 2021, email from McPheeters constituted written notice of an extension to September 25, 2021. The Court is not convinced that the statement "The LOC will also be renewed until 9-25-2021" refers to the P-Card and not the 973 Note. It would make little sense for McPheeters to state that Defendants had breathing room over the spring and summer if he was referring only to the P-Card. There is also evidence in the record that McPheeters and other bank employees, as late as March 29, thought the 973 Note was being extended to September 25, 2021, even if formal approval had not yet occurred. [*See* Parker SOMF ¶ 50, Ex. 14 (email from McPheeters to Higginbotham dated March 29, 2021).]

Certainly, strong arguments exist that the email was not a written notice of an extension of the 973 Note. A legitimate question remains as to whether McPheeters was in fact talking about the 973 Note or the P-Card. The March 29 email does not state that the LOC is extended, but that it will be extended. The previous two extensions were formalized (slightly) by letters, one dated after an email from McPheeters stating that the 973 Line was extended, and one dated before an email from McPheeters that the 973 Line was extended. The only letter in the record extending the maturity date beyond March 25 extended to May 25 only. Internal documents and communications from the bank suggest no internal approval of an extension beyond May 25, 2021 occurred. But the Court must construe the facts in the light most favorable to Defendants on summary judgment, and it concludes that

the question of whether the March 29 email constituted written notice of an extension should be determined by a factfinder at trial.

The Court further rejects First Citizens' arguments that Georgia law forecloses any argument that McPheeters had apparent authority to bind First Citizens to an extension. The cases cited by First Citizens in support of this contention are factually distinct. Both *Wall v. Federal Land Bank of Columbia et al.*, 156 Ga. App. 368, 372 (1980) and *First Nat. Bank & Trust Co. v. Thompson,* 240 Ga. 494, 495 (1978) (and the cases they cite) involved cases where a bank officer allegedly made an oral promise to release a debtor from liability on a note in the future for reasons other than payment in full. That is not what happened here. Defendants have not argued that McPheeters promised to release them from liability, only that he had apparent authority to grant an extension of the maturity date.

In *Sierra Associates, Ltd. v. Continental Illinois National Bank & Trust Company of Chicago* 169 Ga. App. 784, 791 (1984), a case involving an alleged oral promise of a bank officer that the bank would extend the maturity date of a loan in the future, the court concluded the party alleging the promise was aware that the officer lacked authority to bind the bank. Here, Defendants' knowledge of the apparent authority of McPheeters to bind the bank to an extension remains a material question of fact in dispute. The first two extensions came from McPheeters, the contracts were all signed by McPheeters, and the Defendants' primary contact was McPheeters. The Court rejects the proposition that banks enjoy some form of blanket immunity to the normal rules of agency law and that bank officers are free

to say or do whatever they please with customers and counterparties without fear of binding a bank unless some unknown internal approval process has previously authorized the act.

Accordingly, the Court finds a material question of disputed fact exists regarding whether the maturity date of the 973 Note was extended beyond May 25, 2021, which is the source of all of First Citizens' claims against Defendants. The circumstances surrounding the previous extensions, alleged oral representations of extensions, the bank's internal communications regarding extensions, and the relationship between Mr. Parker and McPheeters, including their understanding of the authority of McPheeters to grant extensions, are relevant to this issue and present numerous issues of disputed fact. The Court will therefore deny First Citizens' Motion on its claims.

### C.    **Defendants' Counterclaims and Defenses**

Parker Medical, Midwest Medical, and Mr. Parker each assert three counterclaims. Every Defendant also asserts the affirmative defenses listed above.

####    1. Counterclaim I—Breach of Contract

The first counterclaim is a breach of contract claim for failing to honor the alleged maturity extension to September 25, 2021, and terminating the 973 Line May 25, 2021. As discussed above, the Court finds an issue of disputed fact remains regarding the extension of the 973 Line and the March 29 email. To the extent Parker Medical asserts claims for breach of contract (and related defenses of offset and novation) for failure to extend the 973 Line based on a written extension in the form

of the March 29 email, fact issues remain as to First Citizens' breach of that extended contract and damages to Parker Medical, and the Court will deny the Motion as to Parker Medical's counterclaim and related defenses. However, for the reasons discussed below, the Court finds Midwest Medical and Mr. Parker waived their right to assert their counterclaims, and the Guarantor Defendants waived their right to assert defenses in their guaranties. Thus, even if Parker Medical has a counterclaim and defenses based on a breach of contract claim, Mr. Parker, Midwest Medical, and the other Guarantor Defendants may not assert such counterclaims and defenses in the event First Citizens otherwise establishes a claim against Defendants for amounts owed under the 973 Note or related documents.

2. <u>Counterclaim II—Mutual Departure</u>

The Counterclaim Defendants also assert that a course of dealing between Defendants and First Citizens, through McPheeters, including various oral representations by McPheeters that the maturity date would be extended to September, established a mutual departure from the terms of the 973 Note.

Mutual departure under Georgia law is codified at O.C.G.A § 13-4-4, which provides:

> Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement. The contract will be suspended by the departure until such notice.

As First Citizens points out, "[t]he question of mutual departure is ordinarily for the factfinder, but it may be decided by the court on a motion for summary judgment in the absence of evidence to support such a finding." *Bank of the Ozarks v. Simmons,* No. 4:14-CV-00021-HLM, 2014 WL 12489762, at *4 (N.D. Ga. Sept. 23, 2014). And as Mr. Parker points out, consideration supporting mutual departure may be slight. *AAf-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 220 (2011).

The Court, however, finds no evidence in the record to establish a material fact issue with respect to mutual departure. The only mutual departure from the terms of the 973 Line documents alleged is that First Citizens, either through a course of dealing or oral statements by McPheeters, allegedly extended the maturity date without a written notice of extension as required by the loan documents. But there cannot be a mutual departure if the parties never in fact departed from the terms of the loan documents requiring a written extension or exchanged money while operating under such alleged departure.

The only evidence the Court has found in the record to support a claim that First Citizens or the Defendants operated outside the terms of the maturity date without a written extension or paid any money while operating under the alleged departure is found in an affidavit and declaration of Mr. Parker, in which he states, "Based on Skip McPheeters actual words and his actual conduct, I went forward operating under the line of credit facility, even though operations were outside the maturity date. During the months of October, November, and December 2020, the Defendants and I specifically made draws against the borrowing base in the

traditional ways, and made payments in the traditional way." [Doc. No. 32-2, ¶ 64-65.][10] In reviewing the preceding and subsequent paragraphs of the affidavit, however, it is clear that Mr. Parker's statement that "operations were outside the maturity date" refers to the original maturity date of September 25, 2020, and his statement does not address whether the parties operated outside of any extensions of the original maturity date as specifically contemplated and allowed by the loan documents.

The undisputed evidence in the record—including Parker's own SOMF submitted in opposition to the Motion—shows that First Citizens never allowed the 973 Line to function without a written extension of the maturity date. The original maturity date of September 25, 2020, was extended to December 25, 2020, by written notice through the August Extension Letter dated August 18, which was preceded by an email from McPheeters dated August 17 informing Mr. Parker of the extension. [Parker SOMF ¶¶ 35-37, Exs. 4-5.] The December maturity date was extended to March 25, 2021, a week before its expiration by the December Extension Letter dated December 16, 2020, which was followed by an email from McPheeters dated December 17, 2020. [*Id.* ¶¶ 38-39, Exs. 6-7.] The record contains no evidence of any other written extension from First Citizens prior to March 25, and the record shows that First Citizens froze the 973 Line soon thereafter resulting in an overdraft on March 29. It was not until March 31, when First Citizens provided the March

---

[10] Declaration of Richard L. Parker, Sr. In Support Of "Response in Opposition to Summary Judgment Motion." This declaration was submitted in response to the First MSJ, not the current Motion. The Court has not found any similar statements in the Parker Declaration submitted in response to the current Motion. Mr. Parker made identical statements in a different affidavit submitted in the state court and attached to the removal papers at Doc. No. 1-12 ¶¶ 65-66.

Extension Letter that the "Line was booked." [*Id.* ¶ 55, Ex. 21.] The Court finds Mr.
Parker's statements in previous affidavits that the parties "operated outside of the
maturity date" is not probative of the question before the Court: whether the parties
operated outside the terms of the loan documents, which allowed for written
extensions of the original maturity date. Whether the parties operated outside of the
original maturity date is not particularly relevant where the original maturity date
was extended according to the terms of the loan documents.

Even if Mr. Parker's statements could be read to mean there was no written
extension of the maturity date beyond September 25, 2020 (and not just that they
operated outside of the original maturity date), the Court finds such statement to be
an unsupported, conclusory allegation of no probative value. The Eleventh Circuit
"has consistently held that conclusory allegations without specific supporting facts
have no probative value." *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.
1985); *McKenny v. United States*, 973 F.3d 1291, 1303 (11th Cir. 2020) ("conclusory
affidavits lack probative value" when no explanation or detail given as to how party
arrived at conclusion); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1218 (11th Cir.
2000) (holding non-moving party's affidavit was "little more than a brief, conclusory
assertion of trademark usage," and did "not provide any 'specific facts' supporting
prior use sufficient to create a genuine issue for trial."); *James v. City of Montgomery*,
823 Fed. App'x 728, 731-32 (11th Cir. 2020) (affirming district court's disregarding of
police officer's "conclusory allegations" for workplace discrimination and retaliation

26

because affidavit "provided no specific facts" and was "not supported by any evidence").

The undisputed evidence clearly shows that First Citizens always operated under the terms of the documents requiring an extension of the maturity date to be in writing, and Defendants offer no evidence to support their argument that First Citizens ever intended to depart from such requirement, notwithstanding any alleged course of dealing or oral representations from McPheeters that the 973 Line would be extended to September 25, 2021. Both of the first two extensions involved a written letter and email from McPheeters and, as far as the Court can tell, formal approval by First Citizens, and there is no reasonable factual dispute that the bank followed the letter of the agreements for the first two extensions. A material factual dispute exists whether the March 29 email from McPheeters to Mr. Parker alone satisfied the requirement of a written extension, or whether a written extension could be effective only through a formal letter after internal bank approval. But the Court sees no evidence of a mutual departure from the language of the documents requiring a written extension. Therefore, the counterclaims for mutual departure and the related defense fail as to all Defendants.[11]

3.  Counterclaim III—Fraudulent and Negligent Misrepresentation

The Counterclaim Defendants assert claims for misrepresentation based on the allegedly false information provided by McPheeters that First Citizens either did or would extend the maturity date on the 973 Note to September 2021 to Mr. Parker's

---

[11] Moreover, Midwest Medical and Mr. Parker, and the other Guarantor Defendants, waived any defense or counterclaim based on mutual departure as discussed below at IV.C.4.

and Parker Medical's detriment. They assert claims for both fraudulent misrepresentation and negligent misrepresentation.

As Mr. Parker cites in his brief, "[t]he five elements necessary to be shown [for an action based on fraudulent misrepresentation] are that the misrepresentation or falsehood was knowingly made, that it related to a material fact, that its purpose was to deceive another and induce him to act, that he did act upon it and that he was injured as a result. Where there is no evidence [of] scienter, that is, that the false statement was knowingly made with false design, there can be no recovery. An innocent misstatement may amount to negligence but it is not fraud." *Ideal Pool Corp. v. Baker*, 189 Ga. App. 739, 740, 377 S.E.2d 511, 513 (1988) (quoting *Day v. Randolph*, 159 Ga. App. 474, 475, 283 S.E.2d 687 (1981)).

The Court finds this claim fails as to all Defendants because the record contains no evidence of scienter. Nothing in the record supports a finding that either McPheeters or First Citizens ever knowingly lied about an extension to September 25, 2021, or that they lied with the purpose to deceive the Defendants or induce them to act. The evidence shows that, at a minimum, McPheeters believed the 973 Line would be extended, and Defendants point to no evidence that any other employee or agent of First Citizens knowingly lied to any of the Defendants about an extension of the 973 Line. Further, Defendants fail to point to any evidence that First Citizens knew on or prior to March 29 that it would not extend the maturity date to September. To the contrary, the only evidence in the record shows that First Citizens' decision not to extend the 973 Line to September came after the March 29 email. The Court

finds no evidence supporting a claim for fraudulent misrepresentation, and summary judgment will be granted as to that claim.

"To prove negligent misrepresentation, a plaintiff must show that (1) the defendant negligently supplied false information to foreseeable persons, known or unknown, (2) such persons reasonably relied upon that false information, and (3) economic injury proximately resulted from such reliance." *Brown v. Sullivan*, No. CV 115-035, 2017 WL 3446027, at *6 (S.D. Ga. Aug. 10, 2017) (quoting *Boeing Co. v. Blaine Int'l Grp.*, 624 S.E.2d 227, 231 (Ga. Ct. App. 2005) (footnote omitted)). The Court discerns only two potential false statements, or groups of statements, from the record that could support a claim for negligent misrepresentation. First is the March 29 email from McPheeters. Second are alleged oral promises by McPheeters that the 973 Line would be extended to September 25, 2021. Mr. Parker asserts these oral statements were made at various points, but the record contains no evidence of any specific statements made by McPheeters.

The Court finds material issues of disputed fact preclude summary judgment on the negligent misrepresentation claim of Parker Medical.  The evidence shows that McPheeters believed the maturity of the 973 Note was going to be extended to September, 2021 to align with the maturity of the P-Card, and his March 29 email can be read to represent as much. Further, Mr. Parker contends that McPheeters made numerous representations to him prior to March 29 that the maturity date would be extended to September of 2021. McPheeters denies he made any such

representations, and this is clearly an issue of disputed fact that the Court cannot decide on summary judgment.

The harder question is whether evidence exists to support the Defendants' claims that they reasonably relied upon any alleged oral or written representation and whether such reliance caused them injury. Although there is no evidence that First Citizens waived or departed from the requirement of written extensions, the Court cannot conclude on summary judgment that it was unreasonable for Defendants to rely on any alleged oral or written representations by McPheeters that the maturity date would be extended. Further, the question of harm is a disputed issue of fact. The Court cannot say conclusively that Defendants did not suffer harm by relying on promises of an extension to September. There is evidence to support the Defendants' contention that they were, in effect, blindsided by the bank's decision not to extend to September and unable to continue operations without the 973 Line. Accordingly, the Court will deny the Motion on Parker Medical's counterclaim for negligent misrepresentation (and related defense of estoppel). For the reasons discussed below, however, the Court finds the Guarantor Defendants waived their counterclaims and defenses on this issue.

### 4. The Guarantor Defendants Waived Counterclaims and Defenses

First Citizens argues that Mr. Parker (and the other Guarantor Defendants) cannot assert any of the defenses or counterclaims they have asserted because they waived such defenses and counterclaims in their guaranties. "Georgia courts have consistently enforced waivers contained in guaranties, holding that parties have the

right to freely enter into contracts, including waivers." *In re Buckhead Oil Co., Inc.*, 454 B.R. 242, 247 (Bankr. N.D. Ga. 2011). Additionally, "[a] guarantor may consent in advance to a course of conduct which would otherwise result in his discharge, and this includes the waiver of defenses otherwise available to a guarantor." *HWA Props., Inc. v. Community & Southern Bank*, 322 Ga. App. 877, 887 (2013). The general rule allowing a guarantor to assert defenses and claims available to the borrower, "does not apply to where the guarantor has waived his right to assert those [claims and] defenses." *Roberts v. Community & Southern Bank*, 331 Ga. App. 364, 367 (2015). Numerous other decisions from Georgia courts confirm that Georgia consistently enforces broad waivers of a guarantor's rights to assert defenses. *RES-GA SCL, LLC v. Stonecrest Land, LLC*, 333 Ga. App. 289 (Ga. Ct. App. 2015); *Cmty. & S. Bank v. DCB Invs., LLC*, 328 Ga. App. 605 (Ga. Ct. App. 2015); *Branch Banking & Tr. Co. v. Mitchell F. Cooke*, 2017 WL 4124217 (N.D. Ga. Sept. 15, 2017); *Taylor v. Ameris Bank*, 356 Ga. App. 790 (Ga. Ct. App. 2020); *Ramirez v. Golden*, 223 Ga. App. 610 (Ga. Ct. App. 1996); *Hanna v. First Citizens Bank & Tr. Co., Inc.*, 323 Ga. App. 321 (Ga. Ct. App. 2013).

The guaranties each include extensive waivers, including the following language:

> Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower . . . (F) to pursue any other remedy within Lender's power or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.
>
> Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited

to, any rights or defenses arising by reason of . . . (G) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. . . .

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

*Id.* (emphasis added). On its face, the scope of these waivers appears to be sufficiently broad to cover all defenses and counterclaims asserted by Mr. Parker and the other Guarantor Defendants, and Georgia courts have upheld similarly broad waivers. *Community & Southern Bank v. DCB Invs., LLC*, 328 Ga. App. 605, 610 (2014) ("no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate [the guarantor] or modify, reduce, limit or release [their] liability"); *Hampton Island, LLC v. Asset Holding Co. 5, LLC*, 320 Ga. App. 880, 886 (2013) (all "legal or equitable defenses whatsoever" except for actual payment in full).

Moreover, neither Mr. Parker nor any of the Guarantor Defendants responded to First Citizens' waiver arguments at all in their responses.[12] Parties have a responsibility to respond to an argument contesting their claims in a motion for summary judgment, and failure to respond alone can be a basis for summary judgment. *Burnett v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004). If any authority or reason exists that the counterclaims and defenses of the Guarantor Defendants are not subject to the waiver language in the guaranties, the Guarantor

---

[12] This is the second time Mr. Parker failed to respond to First Citizens' arguments that he waived his defenses and counterclaims. *See* First MSJ (Doc. No. 21-1, p. 17-18) and Mr. Parker's Preliminary Opposition thereto (Doc. 32).

Defendants failed to provide it. The Court, therefore, will grant summary judgment in favor of First Citizens on all counterclaims and defenses asserted by the Guarantor Defendants.

### 5.  There Is No Evidence to Support a Claim for Tortious Interference

First Citizens argues that any claim for tortious interference with contractual relations cannot survive summary judgment. "To prevail on a claim for tortious interference with contractual relations, a claimant must show the defendant (1) acted improperly and without privilege, (2) acted purposefully and with malice with the intent to injure, (3) caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff, and (4) by tortious conduct proximately caused damage to the plaintiff." *Sowell v. Blackmon*, 236 Ga. App. 705, 708, 512 S.E.2d 713, 716 (1999); *Deotare v. Wells Fargo Bank, N.A.*, No. 1:17-CV-699-WSD, 2018 WL 1470897, at *8 (N.D. Ga. Mar. 26, 2018). The Court agrees the record contains no support for a claim for tortious interference for several reasons. First, no evidence of any specific contract or sale transaction exists in the record for which any actions of First Citizens interfered. At best, the Defendants planned to sell the company at some point in 2021 and some parties might have been interested in a transaction, but the record contains no evidence that any specific contracts or transactions were in play in May of 2021. Second, the record is devoid of any evidence that First Citizens acted with any malice or intent to injure any of the Defendants. All evidence indicates the bank was simply seeking to exit the banking relationship and then exercise its remedies under the loan documents. Third, First Citizens argues

that it was not a stranger to any potential sale transactions, and the Defendants offer no response to that argument (or any of First Citizens' tortious interference arguments). The Court concludes the record contains no support for a claim for tortious interference.

That said, it is not exactly clear which counterclaim or defense asserts a tortious interference claim. The Motion does not specify which counterclaim or defense asserts a tortious interference claim, and none of the Defendants offer any insight or response. First Citizens' First MSJ argued tortious interference in connection with Mr. Parker's individual counterclaim, Counterclaim IV, and it seems reasonable to conclude that First Citizens' arguments in the current Motion also relate to Counterclaim IV. But the counterclaim itself, as pled, does not reference tortious interference. Although Mr. Parker failed to respond to the tortious interference claim arguments in the current Motion, he did respond briefly in his opposition to the First MSJ. In that response, he did not dispute characterization of his counterclaim as a tortious interference claim and instead argued that the question of tortious interference should be determined by a jury. If his counterclaim is something other than a tortious interference claim, he has not explained the legal basis for it, and the Court is not aware of his legal basis for asserting damage claims for alleged breaches of a contract he was not a party to. Thus, for the reasons discussed above, the Court agrees that to the extent Mr. Parker's counterclaim was not otherwise waived in his guaranty, it also fails on the merits as a tortious

interference claim. Accordingly, the Court finds summary judgment is appropriate in favor of First Citizens on Mr. Parker's counterclaim in Count IV.

6.   Remaining Defenses Fail

Finally, First Citizens asserts the Defendants have not offered any evidence or facts to support their remaining defenses not otherwise addressed above. Specifically, First Citizens asserts Defendants have not offered evidence to support their affirmative defenses of total or partial failure of consideration, failure to mitigate, impairment of collateral, excused performance, frustration of purpose, impossibility of performance, and unclean hands. Defendants do not respond to any of First Citizens' arguments on these defenses, and the Court agrees with First Citizens that all Defendants have both waived such defenses by failing to respond (if not otherwise waived in the guaranties) and failed to offer any evidence supporting such defenses. Summary judgment is therefore appropriate on each of these affirmative defenses.

## VI.   Conclusion and Order

In the Court's Previous Opinion, it stated that the heart of this case is whether First Citizens agreed or represented that it would extend the 973 Note to September 25, 2021, and all claims, counterclaims, and defenses hinge on the maturity date of the 973 Note. The Court still agrees with that assertion overall, but the record before the Court shows that Defendants failed to bring forth evidence or argument to support most of their counterclaims and defenses. The few that remain still hinge on the maturity date of the 973 Note, as does First Citizens' *prima facie* claims for breach of contract as presented in the Motion. First Citizens might still be able to assert

35

additional breaches or otherwise recover on amounts due under the 973 Note and 063 Note even if a trier of fact were to conclude the maturity date was extended, but it has not moved for summary judgment on such bases or offered evidence or argument to support them.

This case appears ready to proceed to trial, but the Court's ruling on summary judgment raises substantial procedural questions, including whether its ruling on the non-core counterclaims and defenses should be submitted to the district court as proposed findings of fact and conclusions of law prior to proceeding to trial on the remaining claims, counterclaims, and defenses. The Court will schedule a status conference to discuss that issue and other procedural matters relating to a trial.

For all the foregoing reasons,

IT IS ORDERED that the Motion is GRANTED IN PART AND DENIED IN PART:

- The Motion is DENIED on all of First Citizens' claims;

- The Motion is DENIED on Counterclaim I and the related affirmative defenses of novation and offset as to Parker Medical;

- The Motion is GRANTED on Counterclaim II and the related defense of mutual departure and waiver as to all Defendants.

- The Motion is GRANTED IN PART AND DENIED IN PART on Counterclaim III. Summary Judgment is granted as to all Defendants on any claim for fraudulent misrepresentation, and summary judgment is

denied as to Parker Medical on the claim for negligent misrepresentation and the related affirmative defense of estoppel;

- The Motion is GRANTED on the affirmative defenses of total or partial failure of consideration, failure to mitigate, impairment of collateral, excused performance, frustration of purpose, impossibility of performance, and unclean hands as to all Defendants.

- The Motion is GRANTED on all counterclaims and defenses asserted by Midwest Medical, Midwest DME, Midwest Enterprises, and Richard L. Parker.

- With respect to any counterclaims or defenses of Richard L. Parker, Midwest DME, and Midwest Enterprises, the Court's ruling shall constitute proposed findings of fact and conclusions of law to the District Court;

- The Motion is DENIED in all other respects.

The Clerk's office is directed to serve a copy of this Memorandum Opinion and Order on all counsel of record in this adversary proceeding and the chapter 11 trustee.

END OF DOCUMENT